I ask you to speak up much more loudly and right in front of the microphone because I couldn't hear anything you were saying. My name is Carolyn Karkos and I represent Sol Sandoval and I'm here on behalf of the Office of the State of Health Defender. We have raised five issues in this brief for Mr. Sandoval and I would like to focus on issues three and four which have to do with the improper admission of historic cell phone data and also improper text message. In both instances, the trial court erred in allowing this evidence into the trial where both pieces of evidence were not authenticated. First, with regard to the records from T-Mobile that were admitted, they weren't presented through the testimony of a qualified witness or custodian of the records. Instead, it was admitted through the testimony of a lay witness, in this case, a detective. The T-Mobile records indicated that the cell phone that was found on Mr. Sandoval, not registered to him, not shown to have been used by him, was the T-Mobile records showed certain kinds of longitude and latitude. It appears in your brief, and correct me if I'm mistaken, that what you're arguing to us on this issue is that the testimony by Detective Blazanski was admissible because he wasn't an expert. Now, that wasn't the objection raised below, was it? Well, the objection raised below is that his testimony, he wasn't a qualified witness. And what counsel said when he was objecting to this, he said specifically, Blazanski was, quote, not qualified to talk about anything to do with whatever the results of T-Mobile's analysis was. And then again, in his post-trial motion, he said it was double hearsay because now his testimony relied on this information. So he actually was raising a right to confront the witnesses against him, the Sixth Amendment right to confrontation, the inability to cross-examine, excuse me, the witness who actually prepared these records. And in this case, the declarant would be T-Mobile, not an individual. However, they are the custodians of these records. They provided the records to the detective, and they are the ones who needed to present the evidence, given that it wasn't stipulated to them. Yeah, but it seems from the record that the objection made below was a foundational objection. Sure. And now here it looks like you're making an objection. You're arguing the testimony was admissible because he wasn't an expert. No, we're actually arguing both. The first argument is absolutely. It was an insufficient foundation for the reason that it wasn't admitted as a business record, which is an exception to the hearsay rule. And the reason why the judge specifically said this record, which was admitted as people's group exhibit 24, was not being admitted as a business record. All right, let's stop there for a second. When you say the T-Mobile records were admitted as group exhibit 24, it appears, if you read the transcript, that the judge did not admit these records because there was nobody from T-Mobile there, but that the judge said, for the sake of the record, I'll let them in. But it looks like they never went to the jury. But the jury heard it. If I go back 32 years to trial class, I was taught that if an exhibit is not admitted, the judge is still supposed to take custody of it, mark it as not admitted, and make it into the record so that a court of review like us knows what it said and can make a determination as to whether the judge's ruling was correct or not. But if the counsel – I don't agree that it was admitted. Well, would you agree that the detective testified to the content of those records? I'm not sure I do. Okay, yeah, I think that, I guess, is where I should come in. I'm a little bit confused. My understanding of the record was he said it was admitted, but he wouldn't send it back to the jury, and then admitted that it was hearsay and gave no limiting instruction. Right. Well, and if it's hearsay, that violates the defendant's right to confrontation. And in this instance, the counsel – Did he admit it and then refuse to allow it to go to the jury room, or did he not admit it? Or was it never admitted? I contend that it was admitted through the detective's testimony. But if you disagree, I still think that there was reversible error here because his testimony, which relied on these records, ultimately spoke to what his opinion was that the records showed. And the problem is because these were not presented as business records, if you will. We don't know they're reliable. That's the whole point of having the business records exception. Justice Hoffman asked you a really clear question that I think is very important, and you didn't answer it. Could you answer it, please? Did the document go back to the jury? Is that the question you're asking? No. What Justice Hoffman said, my understanding is that it was admitted, and it went back. But the judge decided that it was not going to go back to the jury. Is that what happened, or did it go back to the jury? Physically, did it go back to the jury? It did go to the jury. It's your case, so I'm asking you, what are the facts that you understand them? I guess the problem is that the records that we're discussing are presented to the jury. They're introduced to the jury through the slain witness, who can't speak on behalf of T-Mobile about whether the records are reliable. Whether Lysanski's testimony is incompetent because it's based on hearsay is different than the question of whether the trial judge admitted the spreadsheet into evidence but then declined to allow it to go to the jury. Now, which is it? Well, I guess the record is unclear, because my understanding is that the record was admitted as group exhibit 24. But if I take your position, which you're obviously the court, and if you think it didn't actually be admitted. No, we don't have a position, counsel. You're missing the point. Okay. We're trying to find out what happened in this case. Don't take our position. Tell us what happened. Well, my position and my client's position is that these records were introduced to the jury. They heard about these records. They heard about longitude, latitude. They heard about the cell phone, where the cell phone was allegedly being traced. That was presented to the jury, and that's what the error was, because that information was not presented through a custodian of the records. And this goes back to my point about reliability. They're getting the detective's testimony. He certainly doesn't work for T-Mobile. He can't testify to cell phone technology. He doesn't. He doesn't say he has any specialized knowledge. But he also uses these records to give an opinion in the case. And there's a difference between just saying longitude, latitude, and giving an opinion of what that shows. So his opinion was very specific. His opinion was based on these records, which he has no personal knowledge of. He received them through a search warrant. He's determined in his opinion that the cell phone was tracking the path of the victim. He specifically said that to the jury. And the root of the problem here is that these records were not authenticated. They shouldn't have been used to be the scaffolding, if you will, for the detective's testimony. Because without the records themselves, the detective wouldn't have testified to this at all. So it's really a two-fold problem the way I see it. And that's that we have the opinion testimony, unqualified, about records that were introduced, if you will, without any custodian or qualified witness to speak to them. And while cell phone technology might superficially to people who use a cell phone think, well, we make a call, it connects to the nearest cell tower, that's not necessarily the case. As we can see from other cases that discuss this issue, there's other issues that come into play. And the concern is that defense counsel didn't have an opportunity to properly cross-examine the detective on these issues because he wasn't qualified as a witness in this area of knowledge. And additionally, the other problem with the phone in this case that was not registered to the defendant that found on his person after he was already taken in custody is there was a text message. And that was testified to. I want to point out twice in your brief, page 24, you say that the spreadsheets were admitted into evidence without a proper foundation. Right. You say it twice in your brief. I'm going to ask you again. Did the trial court admit those spreadsheets into evidence? Were they offered by the state and did the trial court admit them? I would have to say yes because that's what I wrote in my brief. I apologize, I don't have the record before me. But given that, I assume that that was my perception of how the record read to me, revealing the record on appeal. But, you know, additionally, I think there's no question that the detective's testimony certainly was presented to the jury and that testimony was based on these records. And as a consequence, it's his testimony that was improper. And the state relied on that testimony throughout the closing argument. They're talking about the cell phone tracking the victim and the cell phone revealed where the defendant was. Well, that's essentially having the cell phone testify against Mr. Sandoval. He has no opportunity to cross-examine that cell phone. Clearly, it would be someone from T-Mobile that could provide the opportunity to cross-examine. And the technology that was involved in collecting this data that was then testified to by the detective. Just also with the cell phone, there was a text message that came in after, again, Mr. Sandoval was in custody. He never received it. He wasn't identified as the intended recipient. He wasn't the registered user. The text message said, what's up with the gold? This is a case involving a certain jury. Okay, so given the actual vocabulary used in the text message, is it a statement or is it simply a question? Well, I think it's a, either way, it's hearsay. Because we don't know the clearness. I know the state has argued that it's a question and therefore the hearsay wasn't applied. To be hearsay, he needs to have an assertion of fact, right? Well, I think it is asserted as a fact. If you look at the state's closing argument, because they're saying, they're linking that statement to Mr. Sandoval saying, you know what's up with the gold. That's what they tell the jury. They're being rhetorical, but it's pretty clear what their intention is in making that argument. Additionally, this is absolute rank hearsay. We don't know who did the clearness. How do we know? First of all, we don't know what's intended for Mr. Sandoval, because it's not registered to him. It's not on. But all we know, he could have been given a cell phone by one of these other individuals who had arrested with him. Additionally, it's hearsay because it violates his right to confrontation, because he has no opportunity to cross-examine whoever sent this message. What if I sent a letter to Mr. Sandoval's house anonymously and said, where's the gold? Well, would he have an opportunity to cross-examine me? Or would that letter just be admitted into trial without anything more? That is, you know, against our longstanding historical recognition about what the right to confrontation means. This is clear hearsay. The state never attempted to identify the declarant. The person who introduced this could have certainly testified that a message was received at a certain time, but not the content. The content is rank hearsay. And this was used for the matter asserted, I think, as you can tell from the state's posing argument. They're using this as direct evidence to link Mr. Sandoval to this particular offense. Initially, you know, the message itself was of the gold. That could be somewhat ambiguous. The state certainly didn't try to put in other crimes evidence. We have no idea if this is about this particular offense, in addition to having no idea who the intended recipient is. So to use this piece of evidence that was never authenticated, the sender never identified, maybe it's the real offender trying to pin this on Mr. Sandoval, because they know he only had the phone, because they saw someone give him the phone while they were moving furniture that day when he was arrested. This is absolutely improper. And the fact that this went into evidence, in addition with the detective's testimony, again with this phone, those two errors violated his constitutional right to confrontation. Again, the defense counsel had no opportunity to cross-examination about this text message. Thank you. Thank you. We'll give you some time now to rebuttal. Counsel? May it please the Court. My name is Sharon Gutenissim, and I represent the defendant, Juan Ramos. In light of the overlap of issues with Mr. Sandoval, I would like to focus on two other issues raised in Mr. Ramos' brief that also resulted in an unfair trial, the tattoo and, if timed, the closing argument notes. The trial court allowed the jury to see a picture of a tattoo on Mr. Ramos' chest of a large gun in the shape of the Chicago skyline. The tattoo was highly prejudicial, had no relevance to his guilt or innocence, and should never have been shown to the jury. Why wasn't it relevant to the identification by the victim? Your Honor, the victim never saw. Because his face is in the picture, isn't it? Sure. So, of course, his face is relevant and what was on his face, but the photo should have been cropped to not show the tattoo on his chest, because that had absolutely no relevance. She never claimed that she saw his bare chest. The perpetrators were wearing shirts during the crime itself, and the fact that a day later Mr. Ramos happened to have his shirt off while he was moving furniture does not suddenly make this very prejudicial tattoo relevant to any trial issue. The photo could have been easily cropped or redacted to not show. Well, we'll give you that the photo could have been cropped, but didn't the judge give a limiting instruction instantly, in a very detailed way, instructing the jury not to consider anything else on the picture? Yes, which shows that he knew what prejudicial was. And the case law seems to tell us that by doing so, any error was obviated because of the limiting instruction, because if there's one presumption we follow, it's that juries follow their instructions. A couple things. Yes, the judge did give a limiting instruction. First of all, he did, though, allow the photo to go back to the jury during deliberations over a defense counsel's objection. So the jury was not only looking at it in that one quick instance where they then got a limiting instruction, but was staring at this gun tattoo while trying to decide if Mr. Ramos participated in a crime involving a gun. And there are cases that do say that sometimes you can't unring the bell. And, Your Honor, I would say that this is one of those cases. This is a very unique, very prejudicial, large tattoo across this entire chest of a gun where we're talking about a crime that involves a gun. I think that asking the jury, relying on the jury compartmentalizing the fact that they saw this tattoo, and then, again, the State actually doesn't mention the tattoo in closing, but directs the jury to look at that exhibit of that photo during their closing argument. And, you know, I assume the jury was looking at it. Now, assuming we found that there was some level of prejudice behind the tattoo picture, we also have to find that this particular item of evidence would have tipped the scale. You know, there's a reasonable probability the result would be different. Now, your defendant was found with the stolen goods on his person, and there's some other problems that he has in the record. How does this tattoo tip the scale so as to create a reasonable probability the result of the trial would have been different had it not been shown to the jury? Sure. Your Honor, we would argue that the evidence against Mr. Ramos is not so overwhelming that this prejudicial tattoo could not have tipped the scales. First of all, there's no confession, no inculpatory statements, no forensic evidence, a very shaky identification from Ms. Snyder, and the rest of the evidence is circumstantial. It is true that Mr. Ramos had one earring on him from the proceeds. However, he had spent the entire day before driving around with his associates, Mr. Urbea and Mr. Moya, in Mr. Urbea's car, where were also found other proceeds from the robbery and shirts that were worn by the perpetrators. It is certainly possible that the earring made its way onto his person within that day where he spent in Mr. Urbea's car. And I certainly don't think that would be enough on its own. And, you know, this, again, this gun tattoo is directly, you know, it's early use could be to show his propensity to have committed this type of crime, that he glorifies guns and violence. And, again, I don't think that you can say that this is harmless beyond a reasonable doubt, Your Honor. The jury saw a picture of a large automatic weapon on his chest while he was on trial for a violent crime. It's hard to imagine anything more prejudicial than that. And seeing as it had no relevance to his guilt or innocence, and the evidence against him was not overwhelming, the jury should never have been allowed to see it, and the error resulted in an unfair trial for Mr. Ramos. I would like to briefly discuss the court's error in closing argument as well. During closing argument, defense counsel held up a transcript, as he had written several notes on his transcript about instances of impeachment that he wanted to explain to the jury during closing argument. The court ruled that he could not use his notes. Now, of course, the court can place reasonable limits on closing argument, but this decision seems to be entirely unreasonable. The judge's rationale for prohibiting counsel from doing what he did seems to stem from the court's concern that the transcript was not certified or proofed, and by reading it, the jury would be persuaded that that had some level of unalterable accuracy that was perhaps in play. But didn't counsel get a chance to make, you know, the argument goes on for about 13 pages, the transcript. Is there anything that you can point that, you know, somehow is not in this argument, this very long, thorough, detailed argument that would have been in there had it not been for the judge's prohibition? A couple things. As to the stated concern of the court, it really doesn't apply here. I mean, the stated concern of the court and other cases having to do with reading the transcript have to do with reading the words of a transcript, admitting it as evidence. There's cases about sending it to a jury, but he only wanted to read his notes. So none of those reasons actually seem to apply here. As to your other question, two things. One is, you know, he had a very detailed post-trial motion where, it's true, he does not point to exact instances, but, you know, an attorney is an officer of the court, and he's saying, my client was prejudiced by my inability to use my notes in closing argument, and he says to point to specific impeachment references was a long trial. There were a lot of witnesses. There was a lot of contradictory and impeaching testimony, and I do think we should take him at his word. Additionally, I'm in no doubt affected the flow and organization of this argument to suddenly find, I'm sure I wouldn't like to suddenly find that I couldn't have my notes. And you're summing up, again, a very long trial. Closing argument is very important to sum everything up for the jury. And, you know, his inability to use his notes could have made a big difference in the quality of his closing argument. The trial court should have allowed counsel to use his notes. There's simply no reason not to, and should never have let the jury see Mr. Ramos's tattoo either. This was a closed case. These errors were not harmless and resulted in an unfair trial for Mr. Ramos, in addition to what my co-counsel has already described. Counsel, thank you. We'll get some time to rebuttal. State? Please record again, Assistant State's Attorney Brian Levitsky on behalf of the people. Your Honors, I would ask to address the evidentiary and transcript issues. I have a couple of questions for you before you get to those. One of the witnesses, Schneider, ID'd Sandoval because he had distinctive eyes. What were distinctive about his eyes? She described them at one point as being goofy, at one point as being a little off-center. I think those were the most descriptive words that she gave. Dysfunctional, she said. Goofy. We don't know anything distinctive about him. Right. He was missing an iris and one eye or something. Nothing like that. Okay. The other question I have is, you rely on people versus white on the issue of whether the testimony was sufficient to establish that this was an armed robbery, whether there was a gun. Correct. The witnesses in Wright testified that the object which they saw looked like a black automatic gun, but then they stated that they were 100% sure that it was a gun. We don't have that kind of testimony in this case, do we? Correct. And I believe, as counsel noted in the reply brief, the witnesses also testified that the object was pushed into their backs, that it was closer physical proximity. But I think what Wright instructs us is that, like any other challenge to the sufficiency of the evidence, we apply the Collins standard. We look at what the testimony was and whether or not it was sufficient to find the elements of the charged offense. The last question I'm going to give you before I let you run is, was the spreadsheet introduced into evidence or wasn't it? Correct. So I think the spreadsheet... It was or it wasn't? It was admitted into evidence. It was. For the purpose of allowing it to be part of the record so that this court could review it. I don't understand. That makes no sense. It makes no sense. And the court is not going to admit it into evidence. The court still takes custody of it and includes it within the record so we can see it on review. Correct. But my understanding of this case is this trial judge actually admitted it into evidence, then said it wouldn't go back to the jury, and then admitted it was all hearsay. My recollection of the transcript is that Detective Wazowski identified it. Again, it never went back to the jury. What the trial court was trying to do was allow there to be some note for it to take custody, and this is how it believed that it was properly doing that. Let's assume for a moment that it is hearsay, but it's sufficiently reliable for an expert to rely on that information. Do you get to argue it as substantive evidence? Your Honor, I think when we look at cases like Pash, the talk about when you have evidence that's admitted through an expert, the reports that they rely on if they're hearsay aren't being offered for the truth of the matter. It's sort of being offered to explain the basis for the evidence. Which means they would never be admitted into evidence. Correct. Okay, go ahead. I think, again, just for the sake of completeness, the judge indicated at one point in the record that it thought that defendants would want the spreadsheet to be admitted for the purpose of appellate review, so that if this court reviewed the issue— It should have been admitted for the purpose of appellate review, as opposed to merely being included in the market. Correct. I can't say that I've seen that before, but I think that's what judges are trying to accomplish. But with respect to the issues that counsels have raised today, whether we look at these issues through the lens of preserved or forfeited error, the evidence in this case is such that if we look at everything that came in, there's no reason or probability that these defendants would not have been convicted based on all the evidence, especially the evidence that they don't challenge. If you didn't admit Wazanski's testimony or the spreadsheets, what have you got other than one of them was in possession of some stolen property? Correct. Is there anything else? Yeah, there is. And the identification of a witness who said that he stole that goofy act. Right. So I think, again, we also have this strong connection in the testimony that links these defendants to the crime through the police work that was done. We have a description. I know the court's aware of these facts. We have the description that's given on the day of the offense. The police retrace Vivas' footsteps. They go to the Berlin food stand. They go to the swap-a-rama. They see this SUV on the surveillance video, which is following Vivas. It matches the description of the SUV that is offered by the occurrence witnesses. And so the jury receives this information that someone's been following Vivas from where he left, ultimately towards the crime scene. And then when the police track down this vehicle, they obtain an address. Ultimately, they go to this location where they find Ramos and Sandoval, as well as more other moving furniture. But it's Sandoval and Ramos who match the description of the offenders provided by Snyder. They are ultimately arrested, and it's not a bullet, although Ramos, Sandoval, Snyder, and Abeja were all in the lineup. It's Ramos and Sandoval who were identified by Snyder. And so if we look at this, we see, and, again, that identification took place within two days of the actual offense. And this is, again, an offense that occurred in broad daylight. So if we look at all of this evidence, we see that there's really no probability that these defendants would not have been convicted absent the admission. This evidence has been challenged. Was Lisansky ever qualified as an expert? No, he was not. He was not? He was not. So what value is his opinion if he's not qualified as an expert? Right. So I think the value of his opinion was that he thought, looking at this information he received from T-Mobile and the spreadsheet, that the cell phone was being used. So is an opinion of a non-expert relying upon a hearsay is what you got? Either hearsay or alternatively, if it was computer-generated information, but we didn't have foundation for that either way. Well, the other question is, absent the computer spreadsheets, how did you trace them from Swap-O-Rama to the victim's house? Correct. So we have the SUV that's seen in the surveillance videos from Swap-O-Rama and the Berlin fruit set, and then the occurrence witnesses see it at the crime scene. So we still know that someone connected with that SUV was following prior to the offense. Okay. So we still have that connection. With respect to the text message on the historical cell site location testimony, again, if we look at what the prejudice analysis is, the fact of the matter is, the jury knew that this wasn't a family that was registered to Sandoval. They knew that they did not hear any evidence that he possessed it on the day of the offense with respect to the historical cell site location. And if you look at that alongside all the other evidence that was admitted, as well as the fact that Sandoval and Franklin Robbins both argued in closing arguments that these were not their cell phones, we see that this was very circumstantial evidence. What it was offered for in closing argument was an inference based on, you know, evidence that had several links in the chain. And so it wasn't prejudicial to either of them. With respect to the text message more specifically, what we have, counsel argues that we don't know if this was a situation where perhaps the real offender sent the text message to Sandoval in order to set him up, as it were. But what Donovan tells us is that when there was sufficient evidence to justify the presentation, that doesn't preclude the opposition from contesting the genuineness of the writing. So Sandoval was free to argue that point. But the question is whether or not there was that very low threshold to show that this text message was, you know, somehow sent by someone who had some knowledge of what was going on to the individual. Are you suggesting that Sandoval had some kind of a burden in this case? No. No. It's always a proponent of the evidence's burden to establish foundation. But once that foundation, that low threshold of foundation has been met, then it becomes a question of what weight to assign it. Do you deny that it's your assignment? No. If you're suggesting that it means he knew something about it. Right. So I think the suggestion that he knew that he meant something about it is, again, an inference. It's taken from widely circumstantial evidence. And what Johnson tells us is that when we have a question, that it doesn't really assert anything and therefore it falls outside of the hearsay analysis. I note in defendant's briefs, they point to the part of Johnson where it says that the defendant's response to the question was a party admission, but the opinion goes on to note that that middle part of the question that was under review did not assert anything and therefore fell outside of the hearsay rule. And we would contend that the question in the text message in this case is similar to the question that was under review in Johnson. With respect to the historical cell site location, again, counsel for Sandoval argues that trial counsel wasn't able to cross-examine the non-expert because he wasn't an expert. However, it's actually, I believe, trial counsel who elicited testimony from Detective Wasansky that from what he understood from this evidence was that the location couldn't be determined within a half mile, which is quite a bit of distance. And if we look at cases like Hill that speak to what the prejudice in admitting this sort of evidence is, it's the danger of overestimation. And we don't have that in this case where Wasansky's explanation of how cell site analysis works didn't overestimate the location of the cell phones. I'd like to turn to the issues of the photograph next. And counsel argues that one possibility was that this could have been cropped, or as counsel argued below, that it could have been somehow redacted. And one of your arguments on that point is that had the tattoo been redacted, that somehow the redaction itself would have drawn more attention, so the jury would start thinking, geez, what's under the big black box on his chest? Right. But I'm not finding that argument very persuasive. All you have to do is just block out his head. Just use a pair of scissors and cut out the head, and this is the head. Correct. So I think then the problem would not have resulted if the court took that position, is that Sandoval's photograph was also admitted, so the jury would have then seen a cropped photo alongside a larger photo. And so we get back to the – That's a bit contrived, though, isn't it? I understand. But at the end of the day, we're looking at the admission of physical evidence in a jury trial, and the judge had to exercise discretion. The judge heard the arguments of counsel, thought about it, came up with a solution, provided this curative instruction, which is very detailed and given almost simultaneously with the admission of the evidence. So under this abuse of discretion standard, we know that reasonable minds can disagree about whether this is the best course of action without finding that it was an abuse of discretion. And counsel argues that the jury may have possibly been staring at this photo when deciding the question of guilt because it was sent back. But the curative instruction went on to say, after disregarding the marks, and did not consider any of those markings in any way arriving at your verdict. So this was a very tailored instruction, a very specific, telling the jurors exactly what to do with this photograph. And there's nothing in the record to indicate that they did anything else. I would ask to just briefly talk about the transcripts then. It's notable that trial counsel wasn't able to really explain how he was prejudiced. The one thing that he did mention in the hearing on the motion for a new trial was that he wanted to impeach, or talk about the impeachment, about whether or not the offenders were wearing turbans. But notably, if you look at the transcript of this long closing argument, after the judge issues this ruling on the use of the transcripts, counsel gets right to that impeachment. And between when the closing argument was delivered and when the hearing for the motion for a new trial was heard, counsel couldn't come up with one other instance where he wasn't able to argue the case that he wanted to. And I think the record suggests that he did actually give a very thorough, passionate defense of this case. And so, again, even if the court could have handled this another way, if reasonable minds can disagree, if this was the right way for a trial judge to conduct a jury trial, the defendant couldn't establish prejudice. But if there are no further questions, with respect to Defendant Ramos, we would ask this court, for these reasons and the reasons stated in our brief, to affirm his conviction and his sentence, and as to Defendant Sandoval, to affirm his conviction. Thank you. Counsel LeBron? Yes, Your Honor, just a few points. This trial was, the hearsay that was at this trial, was outside the rules of evidence, and it violated Mr. Sandoval's right to confrontation. It's very clear the text message was hearsay. He didn't know who the declarant was. The state's argument that it's a question, and therefore it's not hearsay. If a text message was sent saying, when did you stop beating your wife, well, that's a question. I think the state would be, you know, alluding that into evidence. Additionally, the hearsay came in through the detective's testimony, and he's talking about what T. Noble told him. Well, if that's not hearsay, I'm not sure what is. And finally, I would like to just add one point about the Justice Hoffman asked about the firearm. We maintain for the reasons stated in our brief that they didn't prove the unreasonable doubt this was a firearm under the statutory definition, whereas Washington, which is the reading case from the Illinois Supreme Court, in that particular case, the difference was the defendant was charged to lit a dangerous weapon firearm. Here, the statute has been amended, and we have a specific definition. To add to that point, counsel, are you, maybe it's not explicit in your brief, are you making the toy gun argument on this issue? Would it also have been a toy gun, or is some other characteristic of weakness is where you're headed? Well, the state has the burden of proof, sir. I mean, the defendant really doesn't have to say whether it was a toy gun, a water gun. What we're maintaining is the state's amended its burden of proof in showing in this specific case, given the very brief opportunity this woman had to view this, and at one point she says the other defendant had the weapon on the victim, and then later she's saying that my client had the weapon. So in this particular case, under these particular circumstances, given her position, she's at least, I think she said, seven feet from where Mr. Sandoval is, that they didn't prove the unreasonable doubt, which is their burden to prove this is a firearm. Mr. Sandoval has no burden whatsoever with regard to this, since the required otherwise would be improper burden shifting. And for the reasons stated in our briefing here today, we ask that you reverse this conviction. Thank you. Counsel? Very briefly, Your Honors. As for the issue with the tattoo, yes, the judge had discretion, but the judge abused his discretion here. This curative instruction was given, but it was actually given quite a long time before deliberations. We talked about the fact that the jury was looking at it during deliberations. The instruction was given quite a bit of time before that. And in any situation where you're dealing with an error for admitting prejudicial evidence, there's always going to be some speculation involved as to what the jury was doing. But I really can't imagine anything much more prejudicial than this giant gun tattoo. I just also want to, again, argue that Mr. Ramos was prejudiced by all the errors that have been discussed today and just point out the identification evidence that the State briefly mentioned is incredibly unreliable. Ms. Snyder said that they matched the descriptions that she gave. Her descriptions were wildly all over the place, ranging from Mexican to Spanish descent, wearing turbans. She actually never told the police that one of them had a goatee until a second before she identified him in the lineup, and then they asked them all to drop their T-shirts, and he was the only one at that point who had a goatee. And, again, as I pointed out before, the fact that the earring was found on him at the worst, possession of stolen property, but easily explained by his association with Mr. Urbea and being in Mr. Urbea's car where other stolen property was found. We ask you to reverse Mr. Ramos's conviction. Thank you very much. Thank you. Thank you. Counsels, thank you both. That will be taken under advisement of the court's candidate.